IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. STANDIFORD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

SHAWN STANDIFORD, APPELLANT.

Filed August 7, 2018.    No. A-17-714.

Appeal from the District Court for Frontier County: DAVID W. URBOM, Judge. Affirmed.

Justin M. Daake, of Daake Law Office, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Shawn Standiford appeals from his convictions in the district court for Frontier County of two counts of third degree sexual assault of a child and one count of intentional child abuse. On appeal, Standiford challenges the sufficiency of the evidence to support his convictions and the denial of his motion for a new trial based on trial irregularities, prosecutorial misconduct, and unfair surprise. For the reasons set forth below, we affirm.

## II. BACKGROUND

Standiford was charged by amended information with two counts of third degree sexual assault and one count of intentional child abuse against his stepdaughter, S.D. Both sexual assault counts were alleged to have occurred "on or about the month of February, 2015," and the intentional child abuse count was alleged to have occurred "between August 1, 2011 through February 28, 2015." A jury found Standiford guilty on all counts.

## 1. Discovery Motions and Procedure at Trial

### (a) Undisclosed Counseling Records

Prior to trial, Standiford filed a motion for records, asking the court to grant him leave to subpoena "any and all medical records and/or counseling records of the accuser, S.D." The court entered an order directing the State to produce S.D.'s counseling records from K&M Counseling and Lutheran Family Services. Standiford later filed a motion to compel, alleging that the State had not provided all of the counseling records to which he was entitled. The court sustained Standiford's motion to compel.

Before S.D.'s counselor, Kris Steinbeck, testified at trial, Standiford asked the court to allow him to question her outside the presence of the jury about a discovery issue. Standiford asked Steinbeck about two counseling sessions that she had with S.D. after the last session for which he had records. She explained that S.D.'s caseworker requested the sessions as a mental status checkup and that she kept a record of the sessions. The two sessions were focused on how S.D. was doing after she moved from her mother's house to her father's house. Standiford moved to exclude Steinbeck's testimony because the State failed to provide him with records of the two sessions and thus did not comply with the district court's orders on his motion for records and his motion to compel. The court overruled Standiford's motion to exclude Steinbeck's testimony, but limited her testimony to sessions for which Standiford had records.

### (b) Undisclosed Interviews

Prior to trial, Standiford also filed a motion in limine, alleging the State failed to provide him with discovery regarding certain potential witnesses, namely, S.D.'s friends from school at the time of the assault: K.R., C.B., and M.N. He requested that the court exclude the testimony of those witnesses. At a hearing on Standiford's motion, the State denied failing to provide Standiford with discovery regarding the witnesses. The State specifically stated that C.B. and K.R. were mentioned in a report that was turned over to Standiford and that all three girls were mentioned in S.D.'s deposition. Neither the report nor S.D.'s deposition was included in the trial record. The court overruled Standiford's motion in limine, reasoning that Standiford could have deposed the witnesses listed in the motion after the State endorsed them.

In the course of K.R.'s trial testimony, it became clear that the State failed to provide Standiford with recorded interviews of K.R., C.B., and M.N. Instead, the State only gave Standiford a one-paragraph report explaining that an investigator spoke with the girls. After K.R. testified, the State gave Standiford's counsel an unofficial transcript of the recorded interview. Due to the withheld discovery, Standiford moved for a mistrial. In the alternative, he asked the court to strike K.R.'s testimony from the record and to instruct the jury to disregard it. Although the court denied Standiford's motion for a mistrial, it struck K.R.'s testimony from the record and admonished the jury to disregard it.

### (c) Juror Illness and 4-Day Recess

Trial was held on April 11, 12, 13, and 18, 2015. During the afternoon of Thursday, April 13, a juror suddenly left the courtroom. After a short recess, the court explained on the record outside the presence of the jury that a juror had become ill and was unable to continue hearing

testimony that day. Because the court feared the juror's illness might spread to other jurors, it announced a recess until Tuesday, April 18, rather than proceeding with the trial using the alternate juror. Standiford argued that the 4-day recess unfairly prejudiced his defense by giving the State an opportunity to further prepare its case and call a witness who was ill during the first week of trial. The court rejected his argument, noting that on April 12 and on the morning of April 13 it had discussed with counsel its intention not to hear evidence on Friday, April 14 and Monday, April 17. The court told counsel that if they did not finish presenting evidence on April 13, it planned to recess until April 18.

Before dismissing the jury for the weekend, the court gave the following admonishment, to which Standiford did not object:

> One of your jurors became ill before we recessed. I visited with the bailiff and apparently she is ill to the point of vomiting. I visited with the attorneys and I had visited with them before we began today. It became readily apparent to me yesterday that we probably are not going to finish up with the evidence today. I'm fully aware that tomorrow is Good Friday. That there's church services, children are out of school, families coming, families traveling and, so, I advised the attorneys this morning that it was my intent, if we didn't get finished with the evidence, that we would recess until next week to finish the trial. With the illness of [the juror] it appears that's the frugal thing, and the responsible thing, and the best thing for me to do.

> So, we are going to recess for the day today. We will start again next Tuesday at 9:00 o'clock a.m. It's my anticipation that the evidence will be finished on Tuesday and that hopefully the case can be given to the jury sometime Tuesday afternoon. So, make arrangements -- make whatever arrangements that you need to make Tuesday and possibly next Wednesday, in the event that it's necessary that you deliberate past Tuesday, as far as your jobs, and your spouses, and your children and any other things that you have. We will recess today. Enjoy your Easter weekend if you can. We'll see everybody next Tuesday morning . . . .

The court then dismissed the jury and recessed until Tuesday, April 18, 2015. Before the court reconvened, the court asked the jurors whether they had spoken to anyone or heard anything about the case during the 4-day recess. No juror admitted to researching or discussing the case, so the court resumed the trial. Although she had already testified, the State recalled S.D. after the 4-day recess to clarify her testimony. The State also presented the testimony of the witness who was ill the previous week, S.D.'s counselor, Kris Steinbeck.

### (d) Jury Instructions and Closing Arguments

The court held a jury instruction conference at the conclusion of evidence. Standiford objected to the inclusion of negligent child abuse as a lesser offense in the instruction for intentional child abuse. He argued that the evidence did not support a conviction for negligent child abuse. The court found the facts could support a conviction for negligent child abuse, and it overruled the objection.

After the court finalized the jury instructions, the parties presented their closing arguments. Standiford objected on three separate occasions to some of the State's closing comments, arguing

- 3 -

that the State misstated the evidence. But he did not move for a mistrial after any of the three objections. Although the court sustained Standiford's objections, Standiford did not request the court to further instruct the jury about the improper remarks.

## 2. TRIAL TESTIMONY

At trial, S.D. testified that she is the daughter of Gary D. and Melanie Standiford. Although she currently lives with her father, she lived with her mother and Standiford, her stepfather, in Curtis, Nebraska, until April 2015. While then 11-year-old S.D. was in bed on the night of February 18, 2015, Standiford entered her room three times. The first time, he pulled down her pajama pants and underwear, touched her genitals, pulled her clothes back up, and left. S.D. wrapped herself tightly in a blanket to prevent Standiford from touching her again. When he returned, he rubbed S.D.'s back and hair. He asked her whether she was awake, whether she knew how beautiful she was, and said not to tell her mother. After Standiford left, S.D. fell asleep until he entered her room for the third time. Although Standiford wore a shirt during the first two visits, he was shirtless during the third. He placed his hand up S.D.'s shirt, fondled her left breast, and left without speaking.

Because S.D. used her iPad as an alarm clock, the screen was turned off and it was placed on the side of her bed when Standiford entered her room. She testified that during each visit the iPad was not making noise, she was not sleeping on top of it, and she was not wrapped in the iPad cord. Although she testified that the room's television was off during the three visits, she admitted the television was on in her room when she fell asleep. Her sister, G.D., was asleep in the same room during Standiford's visits.

The next morning S.D. told G.D. what happened. At school that day, S.D. told her friends M.N., C.B., and K.R. about the sexual assault and asked them not to tell anyone. One of S.D.'s friends told her mother, who disclosed the assault to the authorities. During the next school day, a police officer, Brett Whittaker, and the school guidance counselor, Teresa Ruppert, took S.D. to Bridge of Hope, a child advocacy center in North Platte, where she was interviewed about the incident.

S.D. explained that Melanie did not support her accusations against Standiford. Melanie spoke with S.D. about changing her story, instructing S.D. to say she dreamed or hallucinated the incidents. Melanie told her to say she was on top of her iPad when Standiford entered the room. To make her mother happy and because she did not want to believe the incident happened, she has told different stories about what happened on the night of February 18, 2015. Specifically, she admitted to telling her personal counselor, a counselor at Lutheran family services, and the school guidance counselor that the assault did not happen.

S.D. explained that since the incident, she has felt uncomfortable wearing loose-fitting clothing to bed. Instead, she now wears to bed pants with elastic that she can tie and a bra. The incident also negatively affected her relationship with her mother and brother because they did not believe her accusations.

S.D. testified that 3 days before the incident with Standiford, she and a friend watched a YouTube video about the "molester moon." The video described people dying after receiving a text message containing three moons. S.D. texted her oldest sister about the video, explaining that she knew the video was a "joke." S.D. testified that she did not know what it meant to be

"molested" at the time she was texting her sister about the "molester moon." Her sister then sent S.D. a text containing the three "molester moons."

S.D. admitted to stating in her deposition that the video described the moon molesting its victims at night in their beds after they received a text containing the three "molester moons." After the court's 4-day recess, S.D. testified further about the "molester moon" video. She explained that she watched the video over the weekend. She described it in great detail and stated that when she originally watched the video, she believed that "molested" meant "murdered." None of her later testimony contradicted her testimony during the State's initial direct examination of her.

G.D. made statements at trial. Although the court made inquiry outside of the presence of the jury into the competency of G.D. to testify truthfully, the court did not administer an oath or affirmation to G.D. before she made those statements. G.D. stated that she was sleeping in the same room as S.D. on the night in question. G.D. did not remember S.D.'s iPad making any noise or Standiford entering the room. The next morning, G.D. indicated that S.D. told her that Standiford did "something bad" to S.D. the previous night. During G.D.'s interview at the child advocacy center, G.D. indicated that she did not remember S.D. telling her about Standiford touching her. At trial, G.D. explained that she withheld the truth from the child advocacy center because she was nervous and scared. G.D. also stated that before the incident occurred, she remembered S.D. telling her about the "molester moon" video.

Whittaker, a Frontier County deputy sheriff, testified that he interviewed Standiford at the sheriff's office. Standiford provided Whittaker a written statement, which explained that he and Melanie went to two bars on February 18, 2015. They returned home at around 3:15 a.m. As Standiford walked downstairs to change his clothes, he heard what he thought was a television in S.D. and G.D.'s room. When he entered the room, he realized S.D.'s iPad on the edge of her bed was making the noise. As Standiford attempted to silence the iPad, S.D. woke up and asked what he was doing. He told her he was turning off the iPad and added that he was sorry he woke her up. He instructed her to go back to bed and left the room.

Melanie testified that she and Standiford went out for drinks on the night of the incident. When they came home in the early hours of the morning, she went to bed. She remembered Standiford climbing out of bed, saying he heard televisions on and that he was going to shut them off. He left for a couple of minutes, and then he returned. Melanie could not recall Standiford getting out of bed after that. Standiford later told Melanie that S.D.'s iPad was making the noise that he thought was a television. Standiford said he had to move S.D. aside and take the iPad cord out from underneath of her to shut it off. After he left the room, the iPad turned on again. Standiford indicated he returned to S.D.'s room again to shut off the iPad.

Melanie heard S.D. deny several times that Standiford assaulted her. S.D. told Melanie that her friends would think she is a liar if she withdrew her accusations. Melanie denied instructing her daughter to withdraw her accusations against Standiford or to say she was wrapped in the iPad cord. Melanie believed S.D.'s accusations were true until she heard S.D. withdraw them for the first time. She had never observed Standiford to be inappropriate with her children, or S.D. specifically, throughout her marriage.

L.D., S.D.'s brother, testified that he also lived with Melanie, Standiford, and his sisters in February 2015. His room was down the hall from the room S.D. and G.D. shared, and he could

hear from inside it almost everything that happened in the house. On the night of February 18, 2015, he remembered hearing a TV on in S.D. and G.D.'s bedroom after they went to bed. When Standiford and Melanie came home that night, he was awake and heard Standiford walk downstairs. L.D. saw Standiford walk by his room and heard him enter S.D. and G.D.'s room. L.D. heard an electronic device playing in S.D. and G.D.'s room at the time Standiford entered it. Standiford did not remain in the room for long. As Standiford walked by L.D.'s room a second time on his way upstairs, Standiford told L.D. "goodnight." L.D. did not hear Standiford come downstairs or enter S.D. and G.D.'s room again.

Amber McNutt, a forensic interview specialist at Bridge of Hope Child Advocacy Center, interviewed S.D. on February 20, 2015. McNutt described the interview protocol at Bridge of Hope, which uses open-ended questions and ensures the child tells his or her story accurately. Her interview with S.D. followed Bridge of Hope's interview protocol. S.D. described the abuse to McNutt chronologically. At the beginning of the interview, S.D. told McNutt that the assault might have been a dream. McNutt testified that children she has interviewed in the past have also dismissed incidents of abuse as dreams. S.D. did not mention the "molester moon" video in her interview with McNutt.

Kerry Crosby, an investigator for the Nebraska Attorney General's Office, testified that he interviewed Melanie and S.D. on March 24, 2015. Based on his interview with Melanie, Crosby concluded Melanie did not support her daughter's accusations against Standiford. He explained that his interview with S.D. did not follow interview protocol because Bridge of Hope had already interviewed her using those protocols. During the interview, Crosby told S.D. "You have to say it happened." He explained that with the comment he meant to communicate to S.D. that some secrets should not be kept. Although he also admitted to making other suggestive statements and asking leading questions during the interview, the information he had at that point made him feel the suggestive statements and leading questions were necessary.

S.D.'s statements to Crosby regarding the sexual assault were ultimately consistent with the statements she made to McNutt at Bridge of Hope. But before she disclosed the sexual assault, she provided Crosby with an alternate story. S.D. told Crosby that she went to bed on February 18, 2015, with the "molester moon" video in her head and she was tangled in her iPad's cord. In reply, Crosby told her "No, I believe it happened, and "I don't think there is any question about that." He told her that it bothers him that her mother and brother do not believe the assault occurred, and he asked whether their disbelief bothered her. She replied that it does not bother her because she did not believe the assault occurred either, instead believing that Standiford was unwrapping her from her iPad cord when he touched her. When S.D. told Crosby that she fell asleep with the TV on, he replied "No, it wasn't on" and "No, he comes in your room and he touches you in a private spot." Crosby made other similar suggestive statements and asked more leading question until S.D. disclosed the assault.

Steinbeck testified that she did counseling with S.D. and Melanie over the past couple of years. Steinbeck performed trauma-focused sessions with S.D., which Melanie periodically sat in on. During therapy, S.D. described having nightmares and flashbacks of Standiford assaulting her. Steinbeck diagnosed her with posttraumatic stress disorder. Based on her sessions with S.D. and Melanie, Steinbeck opined that Melanie influenced S.D. to change her story.

Barbara Sturgis, a clinical psychologist, testified that she regularly sees in her practice adults who were molested as children and child victims of sexual assault. As a result, she keeps up with the literature on child sexual assault. But Sturgis did not have contact with S.D. or review any of the facts in this specific case. She explained that young girls often first report incidences of sexual assault to their friends, asking them not to say anything. In Sturgis' experience, fewer than half of child sexual assault victims disclose when formally interviewed about a later verified incident of sexual assault before having disclosed the incident to an authority figure. Further, Sturgis indicated that when a mother does not believe a child's disclosure about an incident of sexual assault, the child is substantially more likely to recant that disclosure or to become less forthcoming with it.

Sturgis also testified that she is acquainted with proper interviewing technique for child sexual assault disclosures. She admitted that the way an interviewer talks to a child can make a difference in what the child says. She agreed that it can be problematic when an interviewer, rather than a child, introduces new information about a topic of concern in an interview. She further agreed that it would be an improper interview technique for an interviewer to tell a child who has made an accusation of sexual assault that his or her mother does not believe him or her.

### 3. MOTION TO DISMISS, VERDICT, SENTENCES, AND POSTCONVICTION MOTIONS

At the conclusion of the State's case-in-chief, Standiford moved to dismiss the case, which the court overruled. On April 18, 2015, the jury found Standiford guilty of both counts of third degree sexual assault of a child and of the intentional child abuse count, and the court set the sentencing hearing for June 13.

On April 28, 2015, Standiford filed a motion for a new trial with his counsel's attached affidavit. The motion alleged that the court's 4-day recess, the State's failure to comply with discovery orders, the State's misstatements of facts at closing arguments, and improper jury instructions were irregularities that merit a new trial under Neb. Rev. Stat. § 29-2101(1) (Reissue 2016). The motion further alleged that the same facts constituted prosecutorial misconduct and unfair surprise, which entitled him to a new trial under § 29-2101(2) and (3) respectively. The motion also alleged that the verdict was not sustained by sufficient evidence.

Standiford also filed a motion to compel, alleging that the State failed to provide him with the recorded interviews of K.R., C.B., and M.N. as well as certain additional records of Steinbeck's counseling sessions with S.D. On May 18, 2015, the court entered an order sustaining Standiford's motion to compel and directing the State to provide Standiford with the withheld discovery.

At the hearing on Standiford's motion for a new trial, he offered transcripts of the recorded interviews that the State was compelled to provide, and the State offered one of the Steinbeck counseling records. After reviewing the evidence, the court overruled Standiford's motion for a new trial in its entirety.

On June 30, 2015, the court entered an order, sentencing Standiford to incarceration for 18 to 36 months on all three counts, the terms to run concurrently. Standiford appeals.

## III. ASSIGNMENTS OF ERROR

Standiford assigns that the district court erred (1) in failing to grant his motion to dismiss or for a new trial because the evidence was insufficient to support a conviction beyond a reasonable doubt and (2) in failing to grant his motion for a new trial.

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact. A conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Heng*, 25 Neb. App. 317, 905 N.W.2d 279 (2017).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Hairston*, 298 Neb. 251, 904 N.W.2d 1 (2017).

## V. ANALYSIS

### 1. MOTION TO DISMISS AND FOR NEW TRIAL

#### (a) Motion to Dismiss

As a preliminary matter, Standiford's assignment that the district court erred in failing to grant his motion to dismiss is without merit. A defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict but may still challenge the sufficiency of the evidence. *State v. Combs*, 297 Neb. 422, 900 N.W.2d 473 (2017). Because Standiford introduced evidence after the district court overruled his motion to dismiss, he has waived his claim that the district court erred in overruling it.

#### (b) Sufficiency of Evidence

Standiford assigns that the district court erred in denying his motion for a new trial because the evidence was insufficient to support the convictions beyond a reasonable doubt. Standiford insists that no rational trier of fact could have found him guilty beyond a reasonable doubt because S.D. repeatedly withdrew her accusations against him. We disagree.

Standiford was charged and convicted of two counts of third degree sexual assault of a child under Neb. Rev. Stat. § 28-320.01 (Reissue 2016). That section provides that a person commits sexual assault of a child in the third degree if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older. § 28-320.01(1). Neb. Rev. Stat. § 28-318(5) (Reissue 2016) defines the term "sexual contact" as follows:

Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact shall also include the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual assault of a child under sections 28-319.01 and 28-320.01.

S.D. testified that Standiford pulled down her clothes and touched her genitals, that he rubbed her back and hair, and that he placed his hand up her shirt and fondled her left breast. This activity is clearly sexual contact under § 28-318(5).

Although S.D. withdrew her accusations for a time, the State presented testimony from mental health professionals explaining why a child of S.D.'s age and background might do so even though the accusations are true. Standiford presented evidence to support his version of events and to impeach S.D.'s credibility. The jury weighed the evidence and evaluated the witnesses' credibility, apparently concluding S.D.'s testimony was more believable than that of Standiford and his witness. We do not reweigh the evidence or reevaluate witnesses' credibility. See *State v. Heng*, 25 Neb. App. 317, 905 N.W.2d 279 (2017).

Standiford was also charged and convicted of intentional child abuse under Neb. Rev. Stat. § 28-707(1)(a) through (d) (Reissue 2016), which provides, in relevant part, as follows:

(1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:

(a) Placed in a situation that endangers his or her life or physical or mental health;

(b) Cruelly confined or cruelly punished;

(c) Deprived of necessary food, clothing, shelter, or care; [or]

(d) Placed in a situation to be sexually exploited by allowing, encouraging, or forcing such minor child to solicit for or engage in prostitution, debauchery, public indecency, or obscene or pornographic photography, films, or depictions.

We note the State did not charge Standiford under subsection (e) of the statute, which provides that a person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be "[p]laced in a situation to be sexually abused as defined in section 28-319, 28-319.01, or 28-320.01." We also note that the jury was only instructed on subsections (a) and (d) above. Thus, we must determine whether the evidence supports the jury's finding of intentional child abuse under one of those subsections.

We find the evidence supports Standiford's conviction under subsection (a). S.D. described how Standiford's actions have negatively affected her, including her bedtime routine and her relationship with her mother and brother. Further, during therapy sessions with Steinbeck, S.D. described having nightmares and flashbacks of Standiford assaulting her, and Steinbeck diagnosed her with posttraumatic stress disorder. There was sufficient evidence to support a conclusion that Standiford placed S.D. in a situation that endangered her "life or physical or mental health."

Next, Standiford argues the district court erred in finding the record contained sufficient evidence to support his conviction because the State used coercive tactics in an interview of S.D. The record does reflect that, from a psychological perspective, Crosby used questionable techniques when interviewing S.D. But Standiford was able to argue to the jury that S.D.'s statements to Crosby were coerced, calling into question the veracity and credibility of her testimony. And there was sufficient other evidence, outside of S.D.'s statements to Crosby, to support Standiford's conviction.

Prior to her interview with Crosby, S.D. disclosed the abuse in her interview with McNutt at Bridge of Hope, and McNutt testified she conducted that interview in a psychologically appropriate manner. Further, S.D. testified at trial about Standiford's sexual contact with her. And, apparently, the jury believed her testimony. Again, we do not reweigh the credibility of witnesses. See *State v. Heng, supra*. As a result, Standiford's argument regarding Crosby's interview tactics fails.

Standiford further argues that the State's evidence against him was insufficient because it offered no evidence corroborating S.D.'s testimony. But Nebraska law does not require the State to corroborate the testimony of a sexual assault victim in order to convict an accused of sexual assault as defined in § 28-320.01. See Neb. Rev. Stat. § 29-2028 (Reissue 2016).

For the sake of completeness, we note Standiford's argument that S.D.'s testimony was not corroborated by G.D., pointing to G.D.'s statement that she did not recall Standiford entering their shared bedroom on the night in question and her denial of S.D.'s alleged disclosure the next morning during G.D.'s interview at the child advocacy center. Standiford argues that G.D.'s statement at trial where she then recalled S.D.'s disclosing the assault to her the next morning was not credible as it was in direct contradiction to her prior interview. As we pointed out in the background section above, G.D. was not administered an oath prior to making her statements at trial. Nebraska law requires that, before testifying, every witness must "declare that he [or she] will testify truthfully, by oath or affirmation administered in a form calculated to awaken his [or her] conscience and impress his [or her] mind with his [or her] duty to do so." Neb. Rev. Stat. § 27-603 (Reissue 2016). No objection was made at trial to the failure to administer an oath to G.D. and no error was assigned regarding G.D.'s unsworn statements. We need not decide whether the court's failure to administer an oath to G.D. requires that we disregard her statements, however, because we conclude that her statements, if considered, do not change our conclusion that the evidence was sufficient to support Standiford's conviction.

We conclude, therefore, that the district court did not abuse its discretion in finding S.D.'s testimony was sufficient to support Standiford's conviction and in denying his motion for a new trial based on the sufficiency of the evidence.

### 2. MOTION FOR NEW TRIAL

Standiford assigns that the district court erred in failing to grant his motion for a new trial under § 29-2101(1) because irregularities in the proceedings of the district court prevented him from having a fair trial, because of prosecutorial misconduct, and because a surprise occurred at trial that ordinary prudence could not have guarded against. After examining the record, we find that the district court's denial of Standiford's motion for a new trial was not an abuse of discretion.

## (a) Trial Irregularities

Standiford argues that the district court erred in denying his motion for a new trial because irregularities in the proceedings prevented him from having a fair trial. Section 29-2101 provides, in relevant part:

A new trial, after a verdict of conviction, may be granted, on the application of the defendant, for . . . [i]rregularity in the proceedings of the court, of the prosecuting attorney, or of the witnesses for the state or in any order of the court or abuse of discretion by which the defendant was prevented from having a fair trial . . . .

Standiford argues that the court's 4-day recess and its failure to admonish the jury before that recess as well as the State's failure to comply with discovery orders, the State's misstatements of facts at closing arguments, and improper jury instructions were irregularities that merit a new trial under § 29-2101(1). As discussed below, we disagree.

### (i) Court's 4-Day Recess

Standiford argues that the court's 4-day recess was an irregularity in the proceedings that should have prompted the court to grant his motion for a new trial.

A trial judge has broad discretion over the conduct of a trial, and absent abuse, that discretion should be respected. *Malchow v. Doyle*, 275 Neb. 530, 748 N.W.2d 28 (2008); *Jacobsen v. Shresta*, 21 Neb. App. 102, 838 N.W.2d 19 (2013). Here, the trial was originally scheduled for three consecutive days, beginning on Tuesday, April 11, 2015. When it became apparent that the trial would require more than the scheduled time, the court discussed with counsel on Wednesday, April 12, its intent not to hold trial on Friday, April 14, and Monday, April 17. Then, when a juror became ill during the afternoon of Thursday, April 13, the court confirmed its intent to recess until April 18 in consideration of the holiday weekend and to prevent the spread of illness through the jury. Considering the broad discretion trial judges have over the conduct of a trial, we cannot conclude that the district court abused its discretion in taking a 4-day recess in the proceedings.

Standiford further argues that the 4-day recess was improper because it allowed the State to rebut comments he drew out on cross-examination of S.D. regarding the "molester moon" YouTube video. S.D.'s additional testimony on April 18, 2015, did not contradict the testimony she gave during the State's initial direct examination of her. And even without S.D.'s additional testimony, the jury had sufficient evidence to convict Standiford. Additionally, Standiford thoroughly cross-examined S.D. about variations in her story and about the times she withdrew her accusations. It is unlikely that the jury would have produced a different verdict without the additional testimony.

Finally, Standiford argues that the 4-day recess was improper because it allowed the State to introduce the testimony of S.D.'s counselor, Steinbeck. He claims that Steinbeck's testimony was the only evidence showing how his sexual assault of S.D. detrimentally affected her mental health, which he assesses as critical to his conviction for intentional child abuse under § 28-707(1)(a). But, as we discussed above in the sufficiency of the evidence section, S.D. described how Standiford's actions negatively affected her mental health. As a result, the evidence could have supported his conviction for intentional child abuse without the extra witness that the 4-day recess allowed the State to call. Therefore, Standiford's argument fails.

## (ii) Failure to Admonish Jury Before 4-Day Recess

Standiford argues that the district court's failure to admonish the jury before the court's 4-day recess was an irregularity in the trial process that merits granting him a new trial. The court did provide several general admonishments to the jury throughout the proceedings to not discuss the case during recesses. And before the trial reconvened after the 4-day recess, the court asked the jurors whether they had researched the case or discussed it with anyone. Regardless, Standiford did not request that the court give an additional admonishment to the jury before it dismissed the jury for the 4-day recess. He also failed to raise this issue in his motion for a new trial. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018). Therefore, we do not consider Standiford's argument regarding the district court's failure to specifically admonish the jury before the 4-day recess.

## (iii) Noncompliance With Discovery Orders and Comments at Closing

Standiford argues that the State failed to comply with certain discovery orders and made certain misstatements of fact at closing arguments that prejudiced his case. He contends that this conduct is an irregularity in the proceedings that merited granting his motion for a new trial. Standiford cites no cases analyzing noncompliance with discovery orders or a prosecutorial misstatement of fact during closing arguments as an "irregularity of the prosecuting attorney" under § 29-2101(1), and we have found no majority opinions of the Nebraska Supreme Court that directly do so. Although there is some support for the proposition that subsection (1) protects a defendant from prosecutorial misconduct that affect his due process rights, see *State v. McSwine*, 292 Neb. 565, 587 873 N.W.2d 405, 420 (2016) (Connolly, J., dissenting) ("§ 29-2101(1) provides a defendant a statutory remedy to raise prosecutorial misconduct that rises to the level of a due process violation"), most opinions analyze noncompliance with discovery orders and prosecutorial misstatement of fact during closing as prosecutorial misconduct under subsection (2).

Because Standiford also argues that the State's noncompliance with discovery orders and comments at closing were prosecutorial misconduct under § 29-2102(2), it is unnecessary for us to determine whether subsection (1) on trial irregularities applies to prosecutorial misconduct. See *Streck, Inc. v. Ryan Family*, 297 Neb. 773, 787, 901 N.W.2d 284, 294 (2017) ("appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it"). As a result, later in this opinion, we analyze Standiford's motion for a new trial due to prosecutorial misconduct under § 29-2101(2).

## (iv) Improper Jury Instruction

Standiford argues that the jury was improperly instructed on negligent child abuse because there was no evidence to support that instruction. He asserts this improper instruction was an irregularity in the proceedings that entitles him to a new trial.

Whether jury instructions given by a trial court are correct is a question of law. *State v. Cheloha*, 25 Neb. App. 403, 907 N.W.2d 317 (2018). When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court. *Id.* But before an error in the giving of instructions can be considered as a ground for reversal of a

conviction, the error must be considered prejudicial to the rights of the defendant. *State v. Cobbs*, 22 Neb. App. 887, 863 N.W.2d 833 (2015).

Standiford was convicted of intentional child abuse, which is a greater offense than negligent child abuse. Thus, even if the court erred in instructing the jury on negligent child abuse and that error were an irregularity in the proceedings for which the district court could grant Standiford a new trial under § 29-2101(1), the instruction did not prejudice him. Therefore, we conclude the district court did not abuse its discretion in denying Standiford's motion for a new trial on the grounds of the allegedly improper jury instruction.

### (b) Prosecutorial Misconduct

Standiford argues that the trial court should have granted his motion for a new trial because the State on three occasions made misstatements of fact during closing arguments and because the State failed to comply with several discovery orders. For the following reasons, we find the district court did not abuse its discretion in finding that neither was prosecutorial misconduct and, as a result, denying his motion for a new trial.

After a verdict of conviction, § 29-2101(2) allows a trial court on the application of the defendant to grant a new trial because of the misconduct of the prosecuting attorney. When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct. *State v. Hairston*, 298 Neb. 251, 904 N.W.2d 1 (2017). A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct. *State v. Wynne*, 24 Neb. App. 377, 877 N.W.2d 515 (2016). If an appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial. *Id.* Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process. *Id.* Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole. *Id.*

### *(i) Comments at Closing Arguments*

During the State's closing arguments, counsel made three comments to which Standiford objected, including "[L.D.] has an awful relationship with S.D.," "Melanie point blank told S.D. that she's going to have to get in this big chair and lie," and the following:

> There was a lot of talk about this statement by Investigator Crosby, you have to say it happened. That was taken out of context. He didn't approach her out of the blue and say, "You have to say it happened." They were talking about the importance of coming forward, about telling the truth, about saying that something happened in the face of someone telling you be quiet. Don't tell anybody this happened.

The court sustained Standiford's objections to each of these comments. Standiford did not request that the court provide limiting instructions to the jury regarding the comments and did not move for mistrial at the time State made them.

The State argues that Standiford waived any error regarding these comments because he did not move for mistrial when the State made them, citing *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015). But we find *Stricklin* to be distinguishable.

The defendant in *Stricklin* was charged with multiple felonies, including two counts of first degree murder. During closing arguments, the defendant objected to comments the State made, and the district court overruled his objection. The defendant did not move for a mistrial. On appeal, the defendant asserted that the State committed prosecutorial misconduct by making the statements, and assigned as error that he was entitled to a new trial. The Nebraska Supreme Court found that because the defendant did not move for a mistrial at the time that he objected to the State's closing comments, he waived error on the comments. *Id.*

The present case is distinguishable from *Stricklin*. Unlike *Stricklin*, here, the court sustained Standiford's objections to the State's comments as misstating facts in evidence. What is more, unlike the defendant in *Stricklin*, Standiford later filed a motion for a new trial under § 29-2101(2) that specifically claimed the State's comments prejudiced the jury and deprived him of a fair trial. Under these circumstances, we cannot conclude that Standiford waived his argument that the State's comments prejudiced the jury so as to deprive his trial of fundamental fairness.

Nevertheless, we conclude that these comments did not mislead or unduly influence the jury against Standiford, and thus were not prosecutorial misconduct. See *State v. Wynne*, 24 Neb. App. 377, 877 N.W.2d 515 (2016). The statements did not grossly misstate the evidence, and the jury had sufficient facts to convict Standiford in the absence of the State's misleading comments. And, in sustaining Standiford's objections to the statements, the court acknowledged their misleading nature before the jury and implicitly asked the jury to disregard them. Therefore, we conclude that the district court did not abuse its discretion in denying Standiford's motion for a new trial based on the prosecution's comments.

### (ii) Failure to Comply With Discovery Order

Standiford argues that in failing to disclose recorded interviews of K.R., M.N, and C.B., the State withheld material information that impacted his ability to prepare a defense and to receive a fair trial. The State argues the record shows that Standiford was aware of the general nature of these witnesses' testimony "long before the trial began." Brief for appellee at 18. Presumably, the State refers to several reports Standiford received in discovery and S.D.'s deposition, both of which mention these witnesses. The State also argues, citing *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), that if the withheld recorded interviews prejudiced Standiford's defense, he should have cured the prejudice by asking for a continuance.

The defendant in *Gutierrez* discovered at trial that he was missing several hundred pages of police reports relevant to several witnesses' testimony. The defendant moved for a mistrial or, in the alternative, a continuance. The court denied the motion, but the State agreed to allow the defense a weekend to review the missing police reports. The information in the reports generally supported the witnesses' testimony, except that the reports demonstrated one witness' reluctance to help the police. After the defendant was convicted, he appealed the court's denial of his motion for a mistrial or continuance. The Nebraska Supreme Court upheld the conviction, reasoning that the defendant did not show why the weekend he was given was insufficient time to review the reports and that the police reports contained no evidence unknown to him before the State disclosed them at trial. *Id.*

Here, the State provided Standiford with K.R.'s interview during the trial. Like the defendant in *Gutierrez*, Standiford could have cured any disadvantage to his defense by requesting

a continuance to review K.R.'s interview. Further, the district court struck K.R.'s testimony upon Standiford's objection and instructed the jury to disregard it. Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion strike the improper material is sustained and the jury admonished to disregard such material. *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015).

The State did not call M.N. and C.B. as witnesses. Although Standiford might have been able to impeach the State's case using information from these recorded interviews, the interviews generally supported the State's theory of the case. As a result, impeachment using the information in these interviews would be unlikely to change the jury's verdict. In any event, here again Standiford could have cured any disadvantage to his case by requesting a continuance to obtain and review the interviews of M.N. and C.B. See *Gutierrez, supra*.

We therefore conclude the district court did not abuse its discretion in denying Standiford's motion for a new trial based on the withheld discovery.

Standiford also argues that the State's failure to provide the records from two of S.D.'s counseling sessions with Steinbeck unfairly prejudiced his case so as to deny him a fair trial. The State responds that because it did not possess these counseling records and because those records were not relevant to this proceeding, it was not required to produce them for Standiford.

We analyze Standiford's argument under the rule set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In *Brady*, the United States Supreme Court held that the suppression of evidence favorable to an accused violates due process when the evidence is material to either guilt or punishment, irrespective of the good or bad faith of the prosecution. There are three components to a Brady violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued such that there is a reasonable probability that the suppressed evidence would have produced a different verdict. *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017). Evidence is considered material either to guilt or punishment only if there is a reasonable probability that, had such evidence been disclosed to the defense, the result of the proceeding would have been different. *State v. Harris*, 296 Neb. 317, 893 N.W.2d 440 (2017). Furthermore, the suppression of favorable evidence violates the right to due process only if such evidence is sufficiently significant to undermine confidence in the verdict. *Id.*

After reviewing the counseling records at issue, we generally agree that they had little relevance to Standiford's trial, and there is little chance that the result of the proceeding would have been different if the State had disclosed them. And Steinbeck was not allowed to testify about these two counseling sessions. At any rate, because the counseling records had no relevance to the present proceedings, the records were likely not discoverable under *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989). Thus, it was not an abuse of discretion for the district court to deny Standiford's motion for a new trial because the State failed to provide them.

(c) Surprise at Trial

Last, Standiford argues that the withheld discovery materially affected his right to a fair trial because he was unable to review the records and pursue reasonable avenues of defense. Section 29-2101(3) provides that a defendant may file a motion for a new trial based on "accident

- 15 -

or surprise which ordinary prudence could not have guarded against." For the reasons discussed above regarding the withheld discovery, Standiford's argument under this section also fails.

## VI. CONCLUSION

The district court did not err in denying Standiford's motion for a new trial. The evidence was sufficient to support his conviction on all counts. And insomuch as irregularities with the trial, prosecutorial misconduct, and surprise at trial existed, they did not prejudice Standiford's defense.

AFFIRMED.